UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ROCKWALL INDEPENDENT SCHOOL DISTRICT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:12-CV-4429-B** |
| | § | |
| **M.C. and A.C. as next friends of M.C., a minor child,** | § | |
| | § | |
| **Defendants.** | § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's Motion for Summary Judgment (doc. 16). For the reasons that follow, Plaintiff's Motion is **GRANTED in part** and **DENIED in part.**

## I.

## BACKGROUND[1]

Plaintiff Rockwall Independent School District ("RISD")appeals the decision by a Texas Education Agency Hearing Officer that Plaintiff failed to provide Defendant M.C. with a free appropriate public education ("FAPE") in accordance with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq. In addition, Plaintiff brings a breach of contract

[1] The facts are derived from the parties' pleadings, summary judgment briefs, and evidentiary submissions. Unless characterized as a contention by one of the parties, these facts are undisputed. Citations to the Appendix of Exhibits in Support of Plaintiff's Motion for Summary Judgment (doc. 18) are styled as "Pl. App. __" and exclude zeroes prior to the page number. For example, the Court will cite "Pl. App. 33" instead of "Pl. App. 000033."

claim against Defendant M.C., through next friends Defendants M.C. and A.C. (the "Parents"), for an alleged violation of an October 2011 settlement agreement.

A. *Factual Background*

At the time of the due process hearing, M.C. and the Parents resided within the jurisdictional boundaries of the Rockwall Independent School District. Pl. App. 3. M.C. was 16 years old and attended the Dallas Learning Center ("DLC"), a private school located in Richardson, Texas. *Id.* M.C. has a history of suicidal threats and/or attempts, school absences, drug usage, alcohol usage, anxiety issues, and out-of-control aggression issues. *Id.*

1. 2009-2010 - Eighth Grade

Prior to the start of the 2009-2010 school year at RISD, the Parents had M.C. evaluated by a psychologist and psychiatrist. Pl. App. 4. It was concluded that M.C. had Attention Deficit Disorder ("ADD") and depression. *Id.* The Parents informed RISD of this. *Id.* Later, in February 2010, RISD performed a Full Individual Evaluation ("FIE") of M.C. and determined she was eligible for special education services as a student with Emotional Disturbance ("ED") but not as a student with an Other Health Impairment ("OHI"), namely ADD or Attention Deficit Hyperactive Disorder ("ADHD"). Defs.' Resp. 2. In addition, RISD held an Admission, Review, and Dismissal Committee ("ARDC") meeting, during which an Individual Educational Program ("IEP") was developed. *Id.* This IEP included a behavioral intervention plan ("BIP") but did not include a functional behavioral assessment ("FBA"). *Id.*

After this IEP was implemented, M.C.'s problems at school allegedly worsened. Defs.' Resp. 3. She was placed in detention, received both in- and out-of-school suspension, and her grades declined. *Id.* She also became truant. *Id.*

2. 2010-2011 - Ninth Grade

In the fall of 2010, M.C. was enrolled as a ninth grader at Rockwall High School. Pl's. Br. 3. Because she was still considered a student with a disability under the IDEA, her previous IEP remained in place. *Id.*

Prior to the start of the school year, M.C. "sneaked out of her house," drove with a friend, and got into a car wreck. Defs.' Resp. 3. Consequently, M.C. received a 45-day suspension in RISD's disciplinary alternative education program ("DAEP"). *Id.* She was also hospitalized several times. *Id.* After completing her time in the DAEP, M.C. refused to return to school or to stay for a full day because of severe anxiety. *Id.* at 4. M.C. claimed she was being bullied. *Id.* In response, M.C's psychiatrist recommended a residential placement. *Id.*

*i. December 2010 ARDC meeting and revised IEP*

At an ARDC meeting held on December 8, 2010 (the "December 2010 Meeting"), the Parents requested RISD place M.C. in a residential facility. Pl. App. 5. RISD refused to do so. *Id.* Instead, it proposed placement of M.C. in RISD's "Transitions" classroom (the "Transitions Classroom"). *Id.*

By this meeting, the ARDC had completed a counseling evaluation. *Id.* As a result, M.C.'s IEP was changed to include counseling for her for fifteen minutes every other week. *Id.* In addition, the ARDC changed M.C.'s Independent Study Skills, Behavior, and Transition goals and objectives. *Id.* The Parents indicated they were willing to try this arrangement but wanted to see progress such as M.C.'s passing classes and not calling home. *Id.*

*ii. Meridell Achievement Center*

However, before the December 2010 IEP could be implemented, the Parents removed M.C.

from RISD during the second week of December 2010 and placed her at Meridell Achievement Center ("Meridell"). *Id.* at 5, 12. This was done based on the advice of M.C.'s psychiatrist and without the approval or involvement of RISD. Defs.' Resp. 4.

M.C. attended Meridell's residential treatment facility from December 14, 2010 until February 15, 2011. *Id.* A psychiatric evaluation at admission diagnosed her with "Major Depressive Disorder with Psychotic Features" and "Oppositional-Defiant Disorder, Chronic, Severe." Pl. App. 5. In addition, her psychologist recommended intensive individual therapy and noted that M.C. had a very high potential for developing drug and alcohol problems. *Id.* However, by the time of her discharge, M.C. had increased her ability to manage her emotions and improved her coping and problem-solving skills. *Id.* at 6. In addition, an ARDC meeting held at Meridell showed that M.C. was able to access the general education curriculum with accommodations in an academic setting of between eight to twelve students in a class, with faculty/staff available at all times, and escorts between classes.[2] *Id.* Recommendations at discharge included continued therapy on interpersonal relationships, self-motivation, and recognition of thinking errors. *Id.*

*iii. Dallas Learning Center*

Despite her progress, the Parents did not think M.C. was ready to return to RISD. Defs.' Resp. 5. Consequently, M.C. enrolled at the Dallas Learning Center ("DLC"), a non-accredited private school that uses simultaneous enrollment in the University of Nebraska's Independent Study High School, a fully-accredited high school under the North Central Association. Pl. App. 6.

[2] The ARDC was held by the University of Texas - University Charter School ("University Charter"), not by RISD. Pl. App. 290. University Charter provided instruction to M.C. while she was at Meridell. *Id.* at 6.

According to Kathleen Herrin-Kinard, Director of the DLC, the school is a "very structured, tight environment, with constant supervision." *Id.* at 587. In addition, there is a tutoring-type rapport between teachers and students, as students are encouraged to use teachers' first names and there is a maximum ratio of eight students to one teacher for each class. *Id.* at 587, 590. Students also receive a fifteen minute break between each class period. *Id.* at 587. M.C. remained at the DLC for the rest of the spring semester of the 2010-2011 school year. Defs.' Resp. 6.

3. <u>Summer 2011 - First Due Process Hearing and Settlement Agreement</u>

In July 2011, M.C.'s parents filed a request for a due process hearing with the Texas Education Agency. Pl.'s Br. 4. M.C.'s parents sought, *inter alia*, reimbursement for M.C.'s private school tuition for the 2010-2011 school year. *Id.* The parties reached a settlement on October 6, 2011 (the "Settlement Agreement"). *Id.* Pursuant to the Settlement Agreement, RISD agreed to reimburse the Parents $24,122 for expenses incurred in obtaining education services during the 2010-2011 school year and the fall semester of the 2011-2012 school year. Pl. App. 328. In addition, RISD agreed to reimburse the Parents $5,000 in attorneys' fees. *Id.* In exchange, the Parents agreed to move to dismiss with prejudice the pending due process hearing. *Id.* They also agreed

> not to file any litigation, grievance, or complaint of any kind, regardless of whether through IDEA, ROCKWALL ISD Board Policy, state law, federal law, or any other avenue, against [RISD] or its agents or employees based on any factual allegations, regardless of whether asserted specifically in pleadings associated with this claim, arising through the date of the execution of this AGREEMENT.

*Id.* at 328-29. Finally, the Parents agreed to provide RISD no less than thirty days' notice of their intent to re-enroll M.C. in school in the district should they decide to return during the 2011-2012 school year. *Id.* at 329.

4. <u>2011-2012 - Tenth Grade</u>

M.C. finished the fall semester of the 2011-2012 school year at the DLC. However, on or about November 11, 2011, the Parents notified RISD that they intended to re-enroll M.C. in the district for the spring semester. Pl.'s Br. 5. To that end, an ARDC meeting was scheduled and held on December 14, 2011. Pl. App. 128.

*i. December 14, 2011 ARDC meeting*

Several parties attended the December 14, 2011 ARDC meeting (the "December 2011 Meeting"). On behalf of Rockwall High School, the following people were present: Dr. LeMaster, the principal; Shadie Acosta, M.C.'s former algebra teacher; Rochelle Eddy, the special education counselor; Lea Garrett, the specialist in school psychology; Marian Hinton, the chairwoman of the special education department; Sue Peterson, the diagnostician; Debi Buchanan, the special education director; Maurice Lane, the transition teacher; and Cathy Honeycutt, the executive director for special programs. Pl. App. 128. On behalf of M.C. were the Parents and Mara LaViola, their special education advocate (the "Advocate"). *Id.*

The meeting was held to "see how [the ARDC] could come to decisions . . . about [M.C.] and what's in her best interest." *Id.* It began with a cursory review of M.C.'s evaluations, which were considered "current." *Id.* at 129. Ms. Garrett noted that M.C. was "eligible under having an emotional disturbance. That means emotions and behaviors interfere with her learning and education progress." *Id.* In addition, Ms. Garrett indicated that RISD had reviewed this eligibility as well as "some outside evaluations" and a counseling evaluation. *Id.* The "outside evaluation" was a psychological evaluation that was done by Meridell in 2010. *Id.* After some confusion whether the Advocate had all the materials reviewed by the ARDC, Ms. Honeycutt determined that the most

recent evaluations had all been reviewed in previous ARDC meetings and there was no need to review them again. *Id.* at 130. As she said, "I think we all know that the evaluations are, you know, current . . . and that [M.C.'s] disability is for special education and that she's going to get counseling as a related service." *Id.*

The group proceeded to discuss M.C.'s TAKS history from seventh and eighth grades.[3] *Id.* at 130-131. The ARDC moved on to discuss transition services, which focus on how a student will exit from high school by examining career interest and aptitude. *Id.* at 132. The most current information RISD had was that M.C. was interested in cosmetology. *Id.* M.C.'s mother indicated she was no longer interested in that field and now wanted something more. *Id.* The parties from RISD noted this change, indicated that it was common for kids to change their minds, and stated that they could talk to M.C. again if need be. *Id.* at 132-33. The conversation then focused on transition goals, which "define interests and abilities related to potential career and job opportunities." *Id.* at 133.

The Parents expressed concern that they were hearing the same things that had been proposed in the December 2010 Meeting and said they thought the current meeting would focus on what was going on at DLC and how it could be replicated at RISD. *Id.* at 134. Ms. Honeycutt reiterated that they were just discussing transition goals, and it was explained that there were several different transitions to consider: (1) M.C.'s transition back to RISD from private school; (2) the specific Transitions Classroom used to help special education students at RISD; and (3) M.C.'s eventual transition out of high school entirely. *Id.* The Parents indicated they were open to listening

---

[3] "TAKS" refers to the Texas Assessment of Knowledge and Skills test that is required by the State and "designed to measure the extent to which a student has learned and is able to apply the defined knowledge and skills at each tested grade level." TAKS Resources, http://www.tea.state.tx.us/student.assessment/taks/ (last visited Feb. 12, 2014).

to any of RISD's proposals. *Id.*

The ARDC continued by discussing M.C.'s progress in "gen ed." *Id.* at 135. The counselor, Ms. Duran, reviewed M.C.'s grades from the DLC, which were A's and B's. *Id.* Ms. Duran also noted that RISD had not received an official transcript from the University of Nebraska, the accredited school that handled the academic curriculum for the DLC. *Id.* Because there was no transcript from an accredited institution to verify M.C.'s credits, M.C. was still considered by RISD to be a freshman. *Id.* at 136. However, Ms. Duran made clear that once RISD received a proper transcript M.C. could be classified as a sophomore. *Id.*

The parties next focused on behavior needs and a behavior plan for M.C. *Id.* at 139. At this point, Mr. Lane, the teacher in charge of the Transitions Classroom, explained that RISD had independent study skills to try for M.C. to help her master independent study and organizational skills necessary to succeed in the mainstream school environment. *Id.* Specific strategies and goals were then discussed by the parties. Individuals on behalf of both RISD and M.C. contributed to the lengthy review of possible guidelines for both M.C. and her teachers in order for her to reach certain goals by the end of her IEP. *Id.* at 143-58. During this time, the Advocate and the Parents addressed techniques being used at the DLC that were successful for M.C., including daily meetings with her teachers to help her prioritize her work. *Id.* at 148.

From these behavioral and academic goals, the parties turned to addressing counseling goals and objectives. *Id.* at 158. The initial goal was for M.C. to demonstrate improved coping skills in the school setting. *Id.* Specific objectives were highlighted to help her achieve this. *Id.* In addition, thirty minute biweekly counseling sessions with Ms. Eddy, the special education counselor, were added to the services M.C. would receive. *Id.*

The discussion returned to behavioral issues, namely M.C.'s behavior in the classroom. Ms. Acosta, M.C.'s former math teacher, indicated that, while attendance was an issue, M.C. was usually well-behaved and engaged in class. *Id.* at 160. The Parents informed the parties that attendance issues were tied to M.C.'s being bullied. *Id.* at 162. Further, M.C. was scared to return to RISD because of how she had been treated by students there in the past. *Id.* at 163. Different ways of helping M.C. feel safe at RISD were then discussed, including using covert monitors in the hallways. *Id.* at 164. Both the Advocate and the Parents made clear that M.C. felt comfortable at the DLC and would return to RISD if RISD was able to provide structure and support. *Id.* at 165-66. They also explained how M.C. did not want the stigma of being a "special ed" student at RISD, and RISD needed to change M.C.'s perception of Rockwall High School. *Id.* at 176, 185. The parties proceeded to have a lengthy conversation about different ways to mimic the DLC and make M.C. feel more comfortable in RISD, including building in breaks to her class schedule, offering extended time for her to complete tests, utilizing the Transitions Classroom as a smaller, more tailored learning environment, and matching M.C. with a peer buddy. *Id.* at 200-233. Ms. Buchanan, the special education instructor, explained that there is a "continuum of opportunities for [M.C.] to be in a much smaller environment all the way to the full gen ed environment depending on her comfort level, depending on how things are going for her, depending on the day." *Id.* at 230.

At one point the Advocate requested a Functional Behavior Assessment ("FBA") for M.C. *Id.* at 196. Parties from RISD explained that they had a previous FBA from the 2010 ARDC, and that it would be difficult to do another because M.C. had been out of the school for so long. *Id.* The Advocate understood and explained that the prior FBA could be used as an interim until M.C. returned and data could be gathered about her progress at RISD. *Id.* at 196-97. It was then agreed

the plans discussed could serve as in interim until M.C. had a few weeks to settle in at RISD during the next semester. *Id.* The Advocate stressed that she wanted data on the transition to see, for example, how M.C. handled the new situation and whether she came up with her own strategies to cope. *Id.* at 197. The Advocate explained that this would allow the parties to make a "really good BIP for [M.C.]." *Id.*

Towards the end of the ARDC meeting, the Parents presented their own proposal for M.C. M.C.'s father explained that he did not think it was right for M.C. to return to RISD in the middle of the school year. *Id.* at 251. He asked to consider allowing M.C. to stay at the DLC for the spring semester and perhaps take summer classes at RISD to ease her transition back. *Id.* M.C.'s father proceeded to share a letter from the director of the DLC, who explained that it was in M.C.'s best interest to remain at the DLC one more semester. *Id.* at 252. M.C.'s father and the Advocate later mentioned that a slow transition, in which M.C. remained full-time at the DLC but took one or two classes at RISD in the spring, would be appropriate. *Id.* at 252-53. As the Advocate detailed:

> [T]he idea is to establish a smoother transition for [M.C.] that gets the school district to get to know her again, establish those safety–those support networks that she needs in. I mean, she needs friends. She needs safety people, people that she trusts to build that up into like school again and not make it so overwhelming for her.

*Id.* at 254-55.

The session concluded with the parties discussing the next time they would meet to complete the ARDC meeting. *Id.* at 257. No agreement was reached on the proposals discussed, including the Parents' suggestion that M.C. remain at the DLC for the spring semester. It was agreed the ARDC would return on December 20, 2011 to resume the meeting. *Id.* at 256-57.

*ii. December 2011 correspondence and the Interim Plan*

On December 16, 2011, Ms. Honeycutt emailed the Parents to reschedule the upcoming ARDC meeting. Pl. App. 339. Because of the Parents' "unique placement" suggestion that M.C. remain at the DLC, RISD wanted its legal counsel present at the next meeting. *Id.* This required delaying the ARDC meeting until after the holidays. *Id.* M.C.'s father responded to Ms. Honeycutt and expressed concern that doing this would keep M.C. "in limbo," as they needed to get her back to school. *Id.* at 338. Ms. Honeycutt, in turn, indicated they could keep the original date if the Parents were willing to waive the five-day notice necessary for RISD's attorney to be present. *Id.* M.C.'s father then notified Ms. Honeycutt that the Parents had spoken to their attorney and found it unnecessary to return for another ARDC meeting. *Id.* Further, he informed RISD it had five days to respond to the Parents about their request to place M.C. back in DLC for the spring semester. *Id.*

On December 20, 2011, Ms. Honeycutt responded to the Parents' request. *Id.* at 340. Her letter informed the Parents that RISD had reviewed their proposal that M.C. remain at the DLC for the spring semester and ultimately found that the suggestion was inappropriate because RISD was "ready, willing, and able to provide [M.C] with a Free Appropriate Public Education" when school resumed after winter break. *Id.* Accordingly, Ms. Honeycutt asked the Parents to agree to implement the draft "Goals and Objectives" and "Schedule of Services" from the December 2011 Meeting. *Id.* These consisted of goals and objectives in the following content areas: "Transition"; "Behavior"; "Counseling"; and "Independent Study Skills." *Id.* at 122-26.These would serve as interim measures (the "Interim Plan") until the ARDC reconvened in January. *Id.* at 121.

Absent from the Interim Plan was a finalized "Admission, Review, and Dismissal Individualized Education Program Report," which would have included the following sections of a

full IEP: "Development of the Individualized Education Program"; "Summary of Present Levels of Academic Achievement and Functional Performance"; "Behavior Intervention Plan"; "Transition/Graduation/Transfer of Rights"; "Supplementary Aids and Services, Instructional Accommodations, and Supports, Content Modifications and Assessment Accommodations"; "Needed Transitional Services/Coordinated Set of Activities"; "Participation in State and District Assessment Program"; "Least Restrictive Environment Consideration"; and "Placement Determination." *Id.* at 87-109. These missing sections had been in the draft IEP documents RISD brought to the December 2011 Meeting, but they had not been finalized. *Id.* at 87-109, 852. At least some of the sections had been filled in automatically by RISD's computer system based on the December 2010 IEP that was on file. *Id.* at 852, 876.

M.C.'s father responded with an email expressing his extreme disappointment with RISD's position. Pl. App. 73. He rejected RISD's suggestion to implement the Interim Plan from the December 2011 Meeting because much of what was discussed was not reflected in the documents mailed to him. *Id.* Further, he reiterated the Parents' view that RISD could not provide M.C. with a FAPE at that time. *Id.* at 74. He stated that, due to current circumstances and RISD's inability to work with the Parents in developing a "reasonable, workable plan that would ensure . . . continued growth and educational success," he felt compelled to re-enroll M.C. at the DLC for the spring 2012 semester. *Id.*

The Parents and Ms. Honeycutt proceeded to exchange emails, in which Ms. Honeycutt expressed RISD's readiness and ability to provide M.C. with a FAPE and offered to hold an ARDC meeting in early January to finish the IEP before classes at RISD resumed. Pl. App. at 72. The Parents challenged RISD's ability to provide a FAPE and repeated their interest in a slow transition

back to RISD. *Id.* No subsequent ARDC meeting was ever held, and M.C. returned to the DLC for the spring semester.

B. *Procedural History*

M.C. and the Parents filed their Due Process Complaint with the Texas Education Agency on or about February 22, 2012. Pl. App. 2. A due process hearing was held on May 29-30, 2012, before a special education hearing officer appointed by the TEA (the "Hearing Officer"). *Id.* On August 7, 2012, the Hearing Officer issued her decision, in which she concluded, *inter alia*, M.C. and the Parents met the burden to show RISD's proposed December 2011 program was not reasonably calculated to provide progress rather than regression, and thus did not provide a FAPE to M.C. *Id.* at 24. In addition, she found that the Parents' decision to enroll M.C. at the DLC was appropriate and reasonably calculated to enable M.C. to receive educational benefits. *Id.* Finally, the Hearing Officer found M.C. and the Parents were entitled to reimbursement for spring 2012 tuition and course fees. *Id.*

RISD appealed this ruling by timely filing its Complaint (doc. 1) with the Court on November 2, 2012.[4] Defendants filed their Answer (doc. 6) on January 25, 2013. Plaintiff filed its Motion for Summary Judgment (doc. 16) on August 19, 2013. Defendants responded (doc. 19) on September 9, 2013. Plaintiff in turn replied (doc. 20) on September 23, 2013. The Motion is now ripe for the Court's review.

## II.

## LEGAL STANDARD

---

[4] Pursuant to 20 U.S.C. § 1415(i)(2)(B), RISD had ninety days to file its appeal from the date of the Hearing Officer's decision.

A. *Summary Judgment*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine issue exists for trial, the Court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

B. *Review of IDEA Decision*

"The summary judgment standard under the IDEA is a bit different than the standard that applies to most other civil actions." *Austin Indep. Sch. Dist. v. Robert* M., 168 F. Supp. 2d 635, 638 (W.D. Tex. 2001). "The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994). Thus, "the court must receive the record of the administrative proceedings and is then required to take additional evidence at the request of any party." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997). Though the court must give "due weight" to the hearing officer's findings, "the court must ultimately reach an independent decision based on a preponderance of the evidence."[5] *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 394 (5th Cir.

---

[5] Defendants urge this Court to employ a "clear error" standard of review and, in so doing, misconstrue the authority on which they rely. Defs.' Resp. 16. Defendants quote the Fifth Circuit when

2012) (quoting *Cypress-Fairbanks*, 118 F.3d at 252). Accordingly, the district court's review of the special hearing officer's decision is "virtually *de novo*." *Klein*, 690 F.3d at 394 (quoting same). Finally, in the Fifth Circuit, "the party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." *Cypress-Fairbanks*, 118 F.3d at 252.

## III.

## ANALYSIS

### A. *Reimbursement of Tuition for Spring 2012 Semester*

"The IDEA is designed to encourage state and local education agencies to extend services to children that are deemed learning disabled." *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 345 (5th Cir. 2000). Accordingly, federal funds are conditioned on, *inter alia*, the state's providing a "free appropriate public education" ("FAPE") to disabled children. *See Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003). The FAPE "must be tailored to the child's particular needs by means of an individual education program ('IEP'), which is a written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *Id.*; *see also* 20 U.S.C. § 1401(14). In Texas, the responsibility for preparing IEPs lies with Admission, Review, and Dismissal

---

stating that "[w]hile a court is to review a mixed question of fact and law *de novo*, 'the underlying fact-findings, such as finding that a disabled student obtained educational benefits under an individualized education program ('IEP'), are reviewed for clear error.'" *Id.* (quoting *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000)). Unfortunately, this portion of the *Bobby R.* decision refers to the circuit court's review of the district court's decision–not the district court's review of the administrative officer's ruling. *Bobby R.*, 200 F.3d at 347; *see also Klein*, 690 F.3d at 395 ("The district court's findings of 'underlying fact' are reviewed for clear error."). With regard to the latter analysis, *Bobby R.* is clear: the district court "must ultimately reach an independent decision based on a preponderance of the evidence." 200 F.3d at 347 (quoting *Cypress-Fairbanks*, 118 F.3d at 252).

("ARD") committees. *Id.*

Where a school district fails to provide a child with a free appropriate public education in a timely manner, tuition reimbursement for private education is a remedy available to courts and hearing officers. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); *see also R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1011 (5th Cir. 2010). To receive reimbursement, a parent must show that (1) the public school placement was inappropriate under the IDEA; and (2) the private school placement was instead proper. *R.H.*, 607 F.3d at 1011.

1. Was RISD's Proposed Public Placement Inappropriate?

When a parent challenges the appropriateness of an IEP, the district court's *de novo* review is circumscribed by two questions: (1) Did the school district comply with the procedural requirements of the IDEA?; and (2) Is the IEP reasonably calculated to enable the student to receive educational benefits? *Klein*, 690 F.3d at 396. Accordingly, the Court will proceed by first addressing any alleged procedural violations by RISD and then analyzing the substance of RISD's proposed placement and Interim Plan.

*i. Did RISD deny the Parents opportunity to be full participants in the December 2011 ARDC Meeting?*

M.C. does not specifically allege procedural violations, but she nevertheless argues that RISD denied the Parents an opportunity to participate in her IEP by failing to seriously consider their input during the December 2011 Meeting. Defs.' Resp. 29. In particular, M.C. claims that RISD was unwilling to consider any placement for her outside the school district despite evidence of her individual needs and the effectiveness of the DLC. *Id.* at 31. M.C. argues RISD thus "predetermined" her placement and denied "equal consideration" of the Parents' input. *Id.*

Not surprisingly, RISD disagrees with M.C. and insists that the Parents and the Advocate participated fully in the December 2011 Meeting. Pl.'s Br. 15. RISD points out that it incorporated the Parents' input into the draft ARD documents throughout the entire session. *Id.* Further, RISD argues that "[w]hen the facts establish that a school is willing to make adjustments to the student's IEP based upon input from the student's parents, there is no procedural defect based upon predetermination." *Id.*

The Supreme Court has stated that "[p]arents and guardians play a significant role in the IEP process." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Indeed, the IDEA imposes "extensive procedural requirements to 'guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decision they think appropriate.'" *Buser by Buser v. Corpus Christi Indep. Sch.*, 51 F.3d 490, 493 (5th Cir. 1995) (quoting *Honig v. Doe*, 484 U.S. 305, 311-12 (1987)). These requirements include "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child . . . ." 20 U.S.C. § 1415(b)(1). Despite this clear emphasis on parental involvement, "the IDEA does not require school districts simply to accede to parents' demands without considering any suitable alternatives." *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 657 (8th Cir. 1999). Further, the Fifth Circuit has stated that "[a]dequate compliance with the procedures will, in most cases, assure the disabled child's substantive right to free appropriate public education has been met." *Buser*, 51 F.3d at 493 (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1995)).

In this case, the record shows that RISD actively engaged the Parents and the Advocate in

the discussion and formulation of an IEP at the December 2011 Meeting. *See, e.g.*, Pl. App. 171 (MS. GARRETT: "Okay. Tell me what else you want in there."); *id.* at 175 (MS. GARRETT: "What else do you guys see [M.C.] needing in terms of – of the emotional support or what else do you see? Can you articulate something else –"); *id.* at 174 (MS. BUCHANAN: "– what might be missing because we're – again, we're trying to collaboratively, you know, come to an agreement about what the goals are going to look –"). Not only did the Parents and the Advocate frequently voice their questions and concerns about RISD's proposals, but RISD officials repeatedly revised the language of their proposal to incorporate the parties' suggestions. *See, e.g., id.* at 140 (revising language regarding percentage necessary to demonstrate mastery of study and organizational goals with assignment notebook); *id.* at 152 (revising goals to include multi-step breakdown); *id.* at 168 (changing academic goal from "passing" classes to "maintaining As and Bs"); *id.* at 196 (expanding behavior plan to include teacher assistance and allowing M.C. to shift between subjects when frustrated). Consequently, the Court finds no indication that RISD officials did anything to impede the Parents' involvement or discourage their participation. Thus, the Court respectfully disagrees with the Hearing Officer's conclusion that M.C. met the burden to show that the Parents were denied the opportunity to be full participants in the December 2011 Meeting. *Id.* at 24.

The Court also disagrees with the Hearing Officer that M.C. demonstrated predetermination of her placement at the December 2011 Meeting. *Id.* at 22. Key to the Hearing Officer's conclusion was her finding that "[e]ven though the Parents and their advocate were able to speak at the ARDC meeting with input to goals and objectives, the District offered no other placement options." *Id.* at 22. It is unclear what exactly the Hearing Officer meant by "placement options." To the extent the Hearing Officer was referring to the actual program RISD offered, the Court disagrees with her

finding. The transcript of the December 2011 Meeting reveals that RISD officials were open to a range of accommodations for M.C. based upon the techniques employed at the DLC and upon M.C.'s demonstrated comfort at Rockwall High School. That RISD focused on the Transitions Classroom is not damning; the program offered a range of opportunities for M.C. to engage in both the mainstream and special education services as she desired.[6] *See, e.g.*, Pl. App. 230. Further, RISD's willingness to modify its plan according to the Parents' suggestions only reinforces the versatility of the placement and undermines the Hearing Officer's conclusion that RISD was wedded to one proposal.

Unfortunately, the authorities on which the Hearing Officer and M.C. rely no more convince the Court of RISD's alleged procedural violations. Indeed, the cases cited are from other circuits that the Court finds distinguishable. *See Knable v. Bexley City School District*, 238 F.3d 755 (6th Cir. 2001); *W.G. v. Board of Trustees of Target Range School District*, 960 F.2d 1479 (9th Cir. 1992); *Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir. 2004). In *Knable*, the school district failed to hold any IEP conference despite the parents' repeated requests for one. 238 F.3d at 766. Consequently, there was no IEP for the student for an entire school year, and his behavior and academic performance suffered. *Id.* In *W.G*, the school district independently developed an IEP and presented it to the parents without their input or participation. 690 F.2d at 1484. Further, no

---

[6] For example:

> MS. BUCHANAN: But I want to say it so we understand it, is just what I was saying about there is a – a continuum of opportunities for [M.C.] to be in a much smaller environment all the way to the full gen ed environment depending on her comfort level, depending on how things are going for her, depending on the day. . . .
>
> MRS. C. [M.C.'s mother]: Oh, right. Okay.

Pl. App. 230.

alternatives to the program were considered despite the objections of the parents. *Id.* Lastly, in *Deal*, there was credible evidence that the school had an unofficial policy of refusing to provide certain types of instruction for autistic students. 392 F.3d at 858. Further, the school refused even to discuss the possibility of providing certain services despite impressive results. *Id.* As a result, the court found that school personnel did not have open minds to any alternative proposals. *Id.* at 857-58.

This is not the situation presently before the Court. First, RISD responded to the Parents' request to convene an IEP meeting precisely so M.C. could receive the proper educational support. Nothing indicates RISD improperly delayed the meeting or attempted to avoid having one altogether. Second, officials from RISD were receptive to suggestions about how to replicate the techniques used at the DLC. Indeed, RISD seemed quite open to the Parents' and Advocate's input and incorporated their suggestions into the draft plan.[7] In addition, RISD afforded time at the December 2011 Meeting for the Parents to present their own proposal for M.C.'s IEP. There is no indication the Parents' plan was ignored or immediately opposed. If anything, the record suggests the ARDC was going to review the proposal along with the other ideas once the meeting had resumed. *See, e.g.*, Pl. App. 259 ("If you have additional information to share with the ARD Committee regarding [M.C.'s] placement at Dallas Learning Center, the Committee will certainly consider it at the January ARD meeting."); *id.* at 900 (Q: "Would the district have been willing to continue to

---

[7] Defendants acknowledge as much in their Response to Plaintiff's Motion for Summary Judgment:

> There was a lengthy discussion of the goal and objectives for study skills intertwined with a discussion of how these would be implemented in the "Transition Class" with Coach Lane. . . . The outcome of the lengthy discussion was that the original proposed independent study skills IEP was completely changed, because of the objections and suggestions for change made by [the Advocate].

Defs. Resp. 9 at ¶ 22.

consider, in the context of an ARD meeting, placement at Dallas Learning Center at the reconvened ARD meeting?" A: "Yes."). It was only because the Parents refused to return to the ARDC that discussion of the proposal ceased.

The Court recognizes that the Hearing Officer made much of RISD's rejection of the Parents' proposed placement. Indeed, she found it was "outside the ARDC process" and therefore kept the Parents from fully participating in the IEP. Pl. App. 22. Though the Court concurs that the rejection came "outside the ARDC process," it nevertheless disagrees that the rejection demonstrates RISD excluded the Parents from any decision-making. By the time RISD responded to the Parents' proposal, the Parents had removed themselves from the IEP process. Indeed, the record shows that the Parents had no intention of continuing with the ARDC unless RISD approved their proposal.[8] M.C.'s father's testimony at the due process hearing only reinforces this point: "I was more than interested in working with the Rockwall School District on continuing to work with the IEP as long as [M.C.] was able to, you know, do the transition thing that we were talking about." *Id.* at 558. The Court therefore does not find support for the Hearing Officer's conclusion that because RISD rejected the proposal "outside the IEP process" it therefore denied the Parents involvement. On the contrary, the record shows the Parents limited their own participation by adopting an all-or-nothing position.

---

[8] In his letter to Ms. Honeycutt, M.C.'s father stated:

> Since we have already informed the ARD committee of another option to consider with respect to [M.C.'s] IEP and placement, all that is left is for the District to let us know what their decision is. . . . Our attorney has informed us that it is unnecessary to go back to ARD under the circumstances and that the school has five days to get back to us regarding our request to place [M.C.] back in to Dallas Learning Center . . . .

Pl. App. 338.

The Court is also unconvinced that RISD's use of its December 2010 IEP as a starting point for the December 2011 Meeting means it "predetermined" the placement of M.C. or was unwilling to entertain other options for her. RISD's repeated willingness to walk the Parents through its proposal and make revisions according to their suggestions makes this clear. Furthermore,"nothing in the IDEA or its regulations prohibits a school district from coming to an IEP meeting with tentative recommendations for its development prepared in the parents' absence." *Blackmon*, 198 F.3d at 657. Ultimately, the Parents' "right to provide meaningful input is . . . not the right to dictate an outcome and obviously cannot be measured by such." *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003). "Absent any evidence of bad faith exclusion . . . or refusal to listen to or consider [the Parents'] input," the Court finds that M.C. has not met the burden of establishing that the Parents were denied opportunity to be meaningful participants in the IEP process. *Id*. Indeed, the preponderance of the evidence shows that RISD satisfied the procedural requirement with respect to parental involvement.

*ii. Were RISD's proposals reasonably calculated to enable* M.C. *to receive educational benefits?*

The Court now considers whether the RISD's proposals were reasonably calculated to enable M.C. to receive educational benefits. "The IDEA does not entitle a child to an IEP that maximizes his potential, but instead only guarantees a basic floor of opportunity specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *R.H.*, 607 F.3d at 1008 (internal quotation marks omitted). Nevertheless, the educational benefit "cannot be a mere modicum or *de minimis*; rather an IEP must be likely to produce progress, not regression or trivial educational advancement." *Cypress-Fairbanks*, 118 F.3d at 248 (internal

quotation marks omitted) (emphasis in original). In other words, the educational benefit an IEP offers must be "meaningful." *Id.*

To determine whether an IEP satisfies this standard, the Court considers four factors. *See Cypress-Fairbanks*, 118 F.3d at 253. The Court asks whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Id.* Though the Fifth Circuit endorses this analysis, it does not require that district courts consider these factors or weigh them in any particular manner. *See Klein*, 690 F.3d at 397.

a. Incompleteness of the IEP

As a threshold matter, the Court acknowledges that M.C.'s IEP was never finalized at the December 2011 Meeting. *See, e.g.*, Pl. App. 13 ("December 2011 ARDC meeting ended without a completed IEP and with no decision made about the Student's placement."). Though the ARDC reviewed RISD's proposed placement in the Transitions Classroom and discussed revisions to many aspects of it, no final plan was developed. What's more, even the Interim Plan remained unfinished. *Id.* at 337 ("[W]hen we left the meeting . . . the goals, objectives, and schedule of services were still in a developmental phase and nowhere near completion.").

Because the Court is typically asked to review a completed IEP, the first issue to address is whether M.C.'s claims are even ripe for adjudication. RISD argues that the Parents obstructed the IEP process and therefore denied it an opportunity to provide M.C. with a FAPE. Pl.'s Br. 16-17. As a result, RISD suggests more factual development is necessary and implies the Hearing Officer (and perhaps this Court) lack jurisdiction. *Id.* Both M.C. and the Hearing Officer disagree, the latter

noting that M.C. "faced the possibility of a very real risk if she returned to the District without a proper program in place even though the Student's Parents fulfilled the 30-day notice requirement set out in the Settlement Agreement for notification of their intent to re-enroll Student in Spring 2012." Pl. App. 22.

The ripeness of M.C.'s claims before the Hearing Officer and this Court are two separate issues, but both can be resolved by consulting the IDEA. Whenever parents have complaints about the provision of a FAPE or "any matter relating to the identification, evaluation, or education of the a child," the IDEA provides that the parents "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. §§ 1415(b)(6)(A), (f)(1)(A)); *see also El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 937-38 (5th Cir. 2008). To be sure, parents must first address their concerns about a child's FAPE to the local district before a hearing may be held. 20 U.S.C. § 1415(f)(1)(B)(i). However, if the district does not resolve the complaint "to the satisfaction of the parents" within thirty days, the due process hearing may occur. *Id.* at § 1415(f)(1)(B)(ii). Following the due process hearing, "any party aggrieved by the findings and decision" has the right to file a civil action in state or federal district court. *Id.* at § 1415(i)(2)(A).

There is no indication from the parties that the Parents failed to abide by the IDEA's procedural requirements before having their due process hearing. Accordingly, the Court agrees with the Hearing Officer's conclusion that the case was ripe for her review. Further, as the party aggrieved by the findings and decision of the due process hearing, RISD has the right to bring its case before this Court. Consequently, the Court finds that the incompleteness of the IEP does not undermine

its jurisdiction over the present case.

The next and more complicated question is what effect the lack of a final IEP has on the Court's assessment of the substantive adequacy of RISD's proposals. "To determine whether an IEP provides the requisite educational benefit in a given case, some courts will in some circumstances consider only the final version of the IEP that the school system offered during the IEP process." *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 285 (1st Cir. 2008) (collecting cases). However, at least one circuit has stated that when there is no last best offer–"that is, if the parents have initiated the adversary process in advance of the development of a final IEP–it makes very little sense to consider only the latest version of the IEP." *Id.* at 286. In such cases, the First Circuit has remarked that "it would be wrong to put blinders on a reviewing court and restrict its inquiry to the partially completed IEP." *Id.* Accordingly, courts should look beyond the four corners of the partial IEP, if necessary, and "consider issues such as the way in which the IEP process unfolded and the relative responsibility of the participants for the breakdown of the process." *Id.*

Unfortunately, the parties have not provided–and the Court is unaware of–any guidance from the Fifth Circuit on this issue. Given this Circuit's apparent silence and the First Circuit's reasonable advice, the Court will apply the Fifth Circuit's four factor analysis to RISD's proposals–namely, the Transitions Classroom and the Interim Plan, and, to the extent necessary, will consider why the IEP was never finished. To do otherwise–to measure the unfinished IEP against the standards for a final IEP without any regard for why a plan was never completed, not only seems unfair to the party ultimately held accountable but contrary to the IDEA's requirement that the program be a collaboration.

b. Factor 1: Was the program individualized on the basis of M.C.'s

assessment and performance?

The Court first considers whether RISD's proposals were individualized on the basis of M.C.'s assessment and performance. M.C. advances several reasons why they were not. First, she argues RISD failed to conduct a Re-evaluation of Existing Data ("REED"), as required under the IDEA. Defs.' Resp. 24. In particular, M.C. claims that RISD failed to conduct a full evaluation of her at the December 2011 Meeting. Instead, RISD relied on evaluations from February 2010 and thereby neglected to consider that she had since been hospitalized several times and received a recommendation by Meridell for further evaluation to rule out a possible math disorder. *Id.* M.C. also claims RISD's proposals were insufficient because RISD failed to request any classroom-based observations of her by her teachers at the DLC. *Id.* at 25. Though M.C. acknowledges there were telephone conversations between RISD officials and DLC staff, she points out there was no on-site observation of her at the DLC. *Id.* Finally, M.C. faults RISD for failing to develop her "Present Levels of Academic And Functional Performance" ("PLAAFPs") as part of the discussion of her IEP, and, consequently, developing goals and objectives based on conjecture. *Id.* at 25-26.

Despite these claims, RISD insists M.C. has failed to meet the burden to show the proposed IEP was not properly individualized. RISD points out the proposed placement was based upon information from the Parents; information from the DLC; RISD's February 2010 psychological evaluation of M.C.; RISD's December 2010 Full and Individual Evaluation ("FIE") report; information from the Meridell Achievement Center, including a January 2011 neuropsychological evaluation; and other information from M.C.'s student records. Pl.'s Br. 10. RISD also points out that M.C.'s evaluations were less than two years old and therefore current under the IDEA. *Id.* Consequently, there was no need to perform a REED. Pl.'s Reply 5. RISD also insists that there

is no requirement under the IDEA that every evaluation be reviewed in detail at every ARD meeting. *Id.* Finally, RISD argues that the evidence demonstrates that RISD met the IDEA's requirements by including PLAAFPs based on information available to the ARDC at the time of the December 2011 Meeting. *Id.* at 6.

The IDEA requires that a full and individual evaluation be conducted before providing special education and related services to a child with a disability. 20 U.S.C. § 1414(a)(1)(A). In conducting such evaluation, local educational agencies must:

> (A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent . . . [and]
>
> (B) Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child . . . .

*Id.* at § 1414(b)(2). In addition, educational agencies must ensure that the child is assessed in all areas of suspected disability, and that assessment tools and strategies are offered that provide relevant information to directly assist persons in determining the educational needs of the child. *Id.* at §§ 1414(b)(3)(B), (C). Further regulations state that, when performing an initial evaluation or subsequent reevaluation, IEP teams must, *as appropriate*, review existing evaluation data ("REED") on the child, including classroom-based assessments and classroom-based observations. 34 § 300.305(a)(ii). Based upon that evaluation review, the team must then identify what data, if any, are needed to determine the child's present levels of academic achievement and relevant developmental needs. *Id.* at § 300.305(a)(2)(ii). Under the IDEA, reevaluations shall occur at least once every three years, unless the parent and local agency agree the reevaluation is unnecessary. 20 U.S.C. § 1414(a)(2)(B)(ii).

The Court first notes that, according to the record before it, none of the evaluations performed on M.C. was more than two years old at the time of the December 2011 Meeting: (1) the initial FIE was performed in February 2010 (Pl. App. 360); (2) a psychological evaluation was performed in February 2010 (*id.*); (3) a counseling evaluation was performed in December 2010 (*id.*); and (4) a neuropsychological evaluation from Meridell was written in January 2011 (*id.* at 271). Consequently, M.C.'s arguments that RISD's proposals were improper because RISD failed to perform a REED or consider classroom-based observations during the December 2011 Meeting are unavailing. Likewise unremarkable is the Hearing Officer's conclusion that "the District did not undertake any new evaluation efforts prior to the December 2011 ARDC meeting." *Id.* at 20. Because the prior evaluations were less than three years old, RISD was not required under the IDEA to perform a reevaluation of M.C. at the December 2011 Meeting. *See* 20 U.S.C. § 1414(a)(2)(B)(ii). Furthermore, the record shows that RISD reviewed Meridell's neuropsychological report with the Parents in its March 2011 ARDC meeting, and the parties then addressed M.C.'s mental health diagnoses, her progress at the DLC, as well as the structure and techniques employed there. Pl. App. 356. Thus her condition after the initial 2010 evaluation was reviewed prior to the December 2011 Meeting.

Nevertheless, the Court takes seriously both M.C.'s and the Hearing Officer's concerns that the RISD's proposals needed to be tailored to M.C. and reflect her assessment and performance. Indeed the IDEA requires that

> [i]n developing each child's IEP, the IEP Team . . . shall consider (i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child.

20 U.S.C. § 1414(d)(3). In addition, the IDEA states that an IEP includes a "statement of the child's present levels of academic achievement and functional performance, including how . . . the child's disability affects the child's involvement and progress in the general education curriculum . . . ." *Id.* at § 1414(d)(1)(A)(i)(I)(aa).

With these concerns in mind, the Court finds that the preponderance of evidence shows RISD's proposals came from a variety of sources, were individualized to M.C., and reflected the Parent's concerns, the results of M.C.'s evaluations, and her academic and functional needs. The behavioral objectives included in the Interim Plan listed proper use of medication, attendance at school, and reactions to negative peer interactions. Pl. App. 123. These address the particular issues M.C. had at RISD, her identified potential for developing substance abuse problems, and concerns the Parents had about her return. *See, e.g., id.* at 160, 167, 282, 163-64. Counseling goals and objectives similarly reflected M.C.'s particular needs within the school setting, namely identification of internal and external triggers for feelings of anxiety in school, practicing ways to cope with triggers, and applying positive aspects of self to overcome obstacles. *Id.* at 125.These objectives align with the Parents' and Advocate's concerns regarding M.C.'s social challenges, and are appropriate in light of evaluations that show M.C. required help with social anxiety, staying positive, and figuring out ways to act in front of former friends. Pl. App. 165, 61, 172-173. Finally, the independent study skills objectives–using a notebook for assignments, meeting with teachers twice daily, and creating a schedule to prioritize her work, were tailored to M.C.'s particular organizational issues and incorporate tactics from the DLC to help her continued academic progress. *See id.* 139-142, 179.

The transcript of the December 2011 Meeting supports an inference that the final IEP would have similarly drawn from a variety of sources and been further customized to M.C. Indeed, the

changes discussed–building in breaks to M.C.'s schedule, allowing her to shift between subjects when frustrated, raising grade expectations, allowing her to be a peer helper, using covert monitoring in the hallways–were clearly based on input from RISD officials, the DLC, the Parents, and the Advocate, and also designed specifically for M.C. Furthermore, RISD officials seemed quite committed to utilizing its resources to mirror the support M.C. received at the DLC and to foster continued progress. Though the Parents and the Hearing Officer raised concerns about whether these changes would be feasible in a public school setting, such concerns go to the implementation of the IEP and not its design. *See Lewisville Indep. Sch. Dist. v. Charles W.*, 81 F. App'x 843, 847 (5th Cir. 2003) ("In essence, then, the [parents] are dissatisfied with the implementation of the individualized IEP, not with the lack of an individualized IEP itself."). Consequently, the Court does not consider the possible difficulty in employing the final IEP as a an appropriate attack on whether it was customized for M.C.

This is not to suggest the Interim Plan was perfect. Indeed not all of the changes discussed were incorporated into the daft document. For example, as the Hearing Officer correctly noted, during the December 2011 Meeting the parties discussed changing one of M.C.'s goals to "maintain As and Bs" with mastery of 90%, but the document reflected the prior goal of passing grades with a mastery of 70%. Pl. App. 10, 123. In addition, the January 2011 Meridell report indicated there was significant enough a discrepancy between M.C.'s math score and intellectual abilities to warrant "at least consulting" with M.C.'s school district about undergoing more evaluation to rule out a mathematics disorder. *Id.* at 266-67. However, the Interim Plan is silent on this matter. Finally, and perhaps most troubling, the Hearing Officer found that the ARDC did not specifically discuss M.C.'s present functioning, though the PLAAFPs section of the draft IEP materials at the meeting was filled

out. *Id.* at 20, 91.

Regarding the Interim Plan's failure to include all discussed revisions or reference to a possible math disorder, the Court takes seriously these observations but nevertheless finds that RISD's proposals were adequately individualized to M.C. The Interim Plan's goals and objectives were indeed tailored to M.C., as noted above. Furthermore, there is no evidence that the specific concerns regarding her math aptitude would not have been addressed when the ARDC reconvened to finalize the IEP in January. After all, the parties discussed the fact that M.C. struggled in math and agreed that a separate discussion was needed to determine how to award her proper credits. Pl. App. 239. In addition, the parties discussed monitoring M.C.'s performance on tests to determine what strategies worked best for her overall. *Id.* at 210-11. Finally, it was recognized that certain features of a finalized IEP would have to be refined, in particular the BIP and FBA, once the parties could collect data *after* M.C.'s return to RISD.[9] Pl. App. 196-97. Clearly future revisions to the IEP were contemplated by the parties at the December 2011 Meeting.

With respect to the PLAAFP, the Court finds that the Interim Plan was not in compliance with the IDEA, as there was no statement of the "child's present levels of academic achievement and functional performance." 20 U.S.C. § 1414(d)(1)(A)(I). Though the draft IEP documents used in

---

[9] When the Advocate requested a Functional Behavioral Assessment, the parties agreed to use the current one as a temporary measure:

> MS. BUCHANAN: Use this as a starting point, an interim.
> MS. LAVIOLA: I mean, this is like an interim, then.
> MS. GARRET: That's a good idea.
> ...
> MS. BUCHANAN: Could we–how about if we do that, giving [M.C.] a few weeks to kind of settle in.
> MS. LAVIOLA: Absolutely.

Pl. App. 197.

the December 2011 Meeting included a section for such assessment,[10] the Interim Plan materials did not. Indeed, the Interim Plan was limited to just the "Goals and Objectives" and "Schedule of Services" portions of a final IEP report and therefore did not include the section entitled "Summary of Present Levels of Academic Achievement and Functional Performance." Pl. App. 122-27. This deficiency would no doubt be severe if the Interim Plan were a final IEP. However, because the Interim Plan was clearly only a portion of an IEP and never intended to be the full program, the violation is less egregious. Of greater concern is the Hearing Officer's view that, because the ARDC never specifically discussed PLAAFPs during the December 2011 Meeting, the goals and objectives which make up the Interim Plan are "based on conjecture without a clear understanding of [M.C.'s] current levels." Pl. App. 20.

The Hearing Officer is correct that M.C.'s PLAAFPs were never formally discussed during the December 2011 Meeting.[11] However, this does not mean that there was no talk about M.C.'s current performance or abilities. Indeed there was a lengthy exchange of information about her current experience at the DLC and the Parents' and Advocate's assessment of her ability to function in the private and public school settings. Even the Hearing Officer's findings demonstrate this, noting discussion of M.C.'s changing interests in future careers and college; her grades from the DLC; her

---

[10] It appears this section of the draft materials may have been automatically completed by RISD's computer system, which uses information from the last IEP on file. *Id.* at 876.

[11] The Advocate raised this very point during discussion of the "Independent Study Skills" goals and objectives:

> MS. LAVIOLA: And usually we have–we go through present levels of academic and functional performance. I didn't see that. I didn't see it on your agenda. I have been waiting to hear it, so I'm will waiting. I'm waiting to hear it, because I'm curious how these [goals] got developed.

Pl. App. 144.

improved attendance at school; her current credits and possible conflicts with transfer; and how she benefitted from the DLC's particular structure and techniques. Pl. App. 8-13. The transcript of the December 2011 Meeting shows further discussion of the severe anxiety M.C. had about returning to RISD because of bullying and the possible stigma of being a "special ed" student. *Id.* at 176, 190.

With respect to the specific goals and objectives of the Interim Plan, there was a robust exchange of questions and comments between the parties regarding what was appropriate for M.C. Together the Parents, Advocate, and RISD officials not only revised the content of objectives but the degrees of mastery and methods of evaluation as well. *See, e.g.*, Pl. App. 147-55 (developing first study skills objective to focus on recording data in an assignment notebook; second objective to include separate degrees of mastery for homework, projects, and tests; and third objective to include checking in with teachers twice daily); *id.* at 159-60 (adding "data collection" as a method of evaluation because M.C.'s mother felt observation was insufficient). Thus, the Court disagrees with the Hearing Officer's finding that the goals and objectives were not based on a clear understanding of M.C.'s current levels. Instead, the Court finds that the Interim Plan reflected the dialogue of M.C.'s current experiences, abilities, and areas of concern. That the Interim Plan was not a perfect reflection of this discussion must not be dismissed but rather considered in light of the circumstances surrounding the IEP process, which broke down once the Parents refused to return to the ARDC. The Court therefore recognizes that the Interim Plan was incomplete, but also acknowledges that it was understood by the parties to be unfinished, was still subject to the their final approval at the next ARDC meeting, and was only intended as a temporary measure until the ARDC could reconvene.

In this context and in light of the clear focus of ARDC's discussion and proposals to address

M.C.'s needs and abilities, the Court finds RISD's proposals were sufficiently individualized to satisfy the first factor.

c. Factor 2: Was the program administered to M.C. in the least restrictive environment?

The Court next considers whether RISD's proposals were administered to M.C. in the least restrictive environment ("LRE"). As the Parents placed M.C. in the DLC before an IEP was finished or the Interim Plan could be put into effect, the Court will consider how a final program *would have been* implemented.

One of the core mandates of the IDEA is "mainstreaming," which is the requirement that an IEP place a disabled child in the least restrictive environment for his education. *R.H.*, 607 F.3d at 1008.[12] This statutory preference for mainstreaming creates somewhat of a tension with the IDEA's other requirement that a school district provide a free *appropriate* public education. *See id.* at 1008. However, when school officials can mainstream a child, they need not provide for an exclusively mainstreamed environment. *Id.* at 1009 (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1045 (5th Cir. 1989)). The IDEA "requires school officials to mainstream each child only to the maximum extent appropriate. In short, the IDEA's mandate for FAPE qualifies and limits its

---

[12] 20 U.S.C. § 1412(a)(5)(A):

> In general[, t]o the maximum extent appropriate children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

mandate for education in the regular classroom." *Id.* (internal quotation marks omitted).

The Fifth Circuit has articulated a flexible, two-part test for determining whether an IEP placement is in the LRE. "First, we ask whether education in the regular classroom, with the use of supplemental aids and services can be achieved satisfactorily for a given child." *Daniel R.R.*, 874 F.2d at 1048. "If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate." *Id.*

M.C. concedes in her Response that this issue "has never previously been raised . . . by either party in this case." Defs.' Resp. 27. She also acknowledges that the DLC is the "arguably 'more' restrictive environment," but maintains that she was far more successful there than she was at RISD. *Id.* at 29-29. Given her progress at the DLC, she insists that RISD's proposals "cannot be the 'Least Restrictive Environment' because it was likely that [she] would regress if she returned to RISD in the spring of 2012." *Id.* at 29. Not surprisingly, RISD argues that M.C. has not met the burden of establishing that its proposals were *not* the least restrictive environment. Pl.'s Br. 13. Further, RISD stresses that the Transitions Classroom involved a continuum of placements depending on M.C.'s day-to-day needs, with a goal of "mainstreaming the kids and putting them in a less restrictive environment." *Id.* The DLC, on the other hand, would have been a more restrictive placement because its student population had disabilities and/or significant special needs, and the school offered shortened school days and weeks. *Id.* at 14.

The Hearing Officer stated in her decision that "[t]he offered placement at the Transitions classroom was not the LRE as a special education setting," however she provided no explanation for this conclusion. Pl. App. 23. She said only that the "District's plan did not clarify how the Student

would make incremental progress, if at all, into the general education classroom setting," and the "program delivery was unclear–including what classes, where breaks would be held, and a myriad of other details left unspecified in such a way that no 'interim IEP' existed after the December 2011 ARDC." *Id*. Nevertheless, these observations, coupled with M.C.'s concession that the DLC was a "more restrictive" environment, do not convince the Court that RISD's proposals did not meet the LRE requirement.

Instead, the Court finds that RISD's proposals were designed to mainstream M.C. to the maximum extent appropriate and therefore satisfied the IDEA. RISD officials were explicit in the December 2011 Meeting that the proposed IEP would be flexible and allow M.C. to take classes in the general education environment as she felt comfortable. Pl. App. 180-82. Though the IEP no doubt relied heavily on the Transitions Classroom, there was no indication that M.C. would be denied the chance to re-integrate with her peers in the mainstream setting. In fact, RISD was clear that "we do encourage our kids to go into the mainstream as much as–as possible." *Id.* at 182. Furthermore, RISD was prepared to work with M.C. to make sure that she was not forced into a mainstream environment, but instead would take regular classes as she was ready.[13] *Id.* Given this clear focus on creating a flexible plan for mainstreaming M.C. at her own pace, the Court finds inconsequential the fact that RISD did not articulate precisely when or how she would reintegrate with her non-disabled peers. "When a child attends his normally assigned school and is

---

13

> MS. GARRETT: I know she's going to be nervous coming back, and we'll have to talk to her and maybe it might depend on the teacher and the kids in the class. But we would like to encourage her to go to at least – I'd like her to go to at least one or two classes from the start just to have her foot in the water. But that's something – ... – that we can be flexible on.

Pl. App. 182.

'mainstreamed with his peers as much as possible,' the environment is the least restrictive environment." *Hooker v. Dallas Indep. Sch. Dist.*, No. 3:09-CV-0676-G-BH, 2011 WL 1592300, at *10 (N.D. Tex. March 31, 2011) (citing *Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609, 620 (5th Cir. 2005)).

Though the Court is sensitive to M.C.'s argument that she demonstrated clear progress at the DLC, it finds it inapposite with respect to the present inquiry. First, the question is whether RISD's proposals would have mainstreamed M.C. to the maximum extent appropriate, not whether the DLC would have promoted her achievement. *See Daniel R.R.*, 874 F.2d at 1048. Second, the IDEA "makes removal to a private school placement the exception, not the default." *R.H.*, 607 F.3d at 1014. Consequently, the Court finds M.C.'s implicit suggestion to use her performance at the DLC as a baseline in its present assessment of RISD's plans inappropriate. Finally, the Fifth Circuit has warned courts to "be cautious before holding that a school district is required to place a child outside the available range of public options." *Id.* at 1015. The Court is therefore reluctant to dismiss RISD's proposals for M.C. to receive an education in a public school setting, notwithstanding M.C.'s success at the DLC.

Though the Court gives due weight to the Hearing Officer's opinion, the Court nevertheless finds the preponderance of evidence shows RISD satisfied the LRE requirement.

d. Factor 3: Were the services for M.C. provided in a coordinated and collaborative manner by key "stakeholders"?

Neither the parties nor the Hearing Officer addressed this factor. However, the Court recognizes that the alleged procedural violations previously discussed could reasonably be construed as claims relevant here. *See R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 811 n.8

(5th Cir. 2012). With that in mind, the Court again considers M.C.'s allegation of RISD's denial of the Parents' full participation and "predetermination" of her IEP. However, for the same reasons these claims do not constitute procedural violations, they also do not demonstrate that the educational services were not (or would not have been) provided in a sufficiently coordinated and collaborative manner by key stakeholders, including M.C.'s parents. *See id.*

e. Factor 4: Were positive academic and non-academic benefits for M.C. demonstrated?

The final factor for the Court to consider is whether positive academic and non-academic benefits for M.C. were demonstrated under RISD's proposals. The Fifth Circuit has stated that this is "[p]erhaps one of the most critical factors" in the IEP analysis. *Houston Indep. Sch. Dist. v. Juan P.*, 582 F.3d 576, 588 (5th Cir. 2009).

Arguing that academic and non-academic benefits were not likely, M.C. stresses that there was no clear plan in place for her return to RISD following the December 2011 Meeting. Defs.' Resp. 26. She points out that, though RISD officials reassured the Parents that there was no service or accommodation provided by DLC that RISD could not provide, they testified that they did not believe it was necessary to replicate the DLC exactly in order to give her a FAPE. *Id.* M.C. further highlights the "confusing" nature of the proposed Transitions Classroom placement. *Id.* at 27. She also alleges that another proposed accommodation, building in breaks to her class schedule, would have left her out of synch with the RISD's "gen ed" schedule. *Id.* Overall, M.C. insists that RISD's plans were likely to lead to regression and therefore would have denied her a FAPE.

RISD disagrees and insists its proposals were calculated to provide M.C. with a meaningful educational benefit. Pl's. Reply 7. RISD points out there is no evidence that the Transitions

Classroom would have caused regression because the proposed placement was never implemented. *Id.* RISD further argues that, by focusing on her success at the DLC, M.C. has taken "the erroneous position that 'because a given school is allegedly more appropriate than another school, the less appropriate school becomes inappropriate.'" *Id.* (quoting *Hessler v. State Bd. of Educ.*, 700 F.2d 134, 139 (4th Cir. 1983)).

Again, the Court acknowledges that no IEP was ever finalized or put into place, and thus there is no evidence of actual benefit or regression. However, the Fifth Circuit has stated that, "although positive educational outcomes can signal that an IEP is appropriate under the IDEA, the appropriateness of [an] IEP ultimately turns on whether it was *reasonably calculated* to provide an educational benefit and does not hinge on the showing of an actual positive outcome." *S.H. ex rel. A.H. v. Plano Indep. Sch. Dist.*, 487 F. App'x 850, 859 (5th Cir. 2012) (emphasis in original). Thus, the Court will follow the Hearing Officer's lead and consider the likelihood of a successful outcome under RISD's proposals.

As part of her conclusion that RISD denied M.C. a FAPE, the Hearing Officer found that academic and non-academic benefits of the proposal were unclear. Pl. App. 23. In particular, she noted that only "generic" classes had been specified and topics like lunch, hallway issues, and breaks were vague. *Id.* By contrast, M.C. was experiencing "great success in the private placement with one-on-one instruction and in a smaller setting without any additional hospitalizations." *Id.* Consequently, the Hearing Officer decided that it was appropriate for the Parents to continue her placement at the DLC because it was "highly likely" that M.C. would regress if overwhelmed. *Id.*

Though the Court gives due weight to these findings, it nevertheless disagrees with the Hearing Officer's conclusions. Courts have "repeatedly held that a FAPE need not be the best one

possible, or the one calculated to maximize the child's educational potential; it only has to provide an educational opportunity designed to meet the student's special needs, with sufficient support services to allow him to benefit from the instruction." *Adam J.*, 328 F.3d at 810. Further, this Circuit has found passing grades and advancement from year to year to be indicia of meaningful educational benefit. *See Juan P.*, 582 F.3d at 590. In light of these standards and the record before it, the Court finds M.C. has failed to establish that RISD's proposals did not satisfy this standard.

The evidence makes clear that M.C. functioned best in an environment that was structured, predictable, had a low student-to-teacher ratio, and included time to take breaks to refocus or socialize. *See* Pl. App. 42, 267, 299-300, 313. In such a setting M.C. was able to make "steady gains" and improve her grades, behavior, and peer interactions. *Id.* at 21, 299, 346. This seems to be the type of environment that RISD was trying to create with its proposed placement. The Transitions Classroom, where M.C. would perform the work of her "gen ed" classes, would have had anywhere from seven to ten students. *Id.* 181, 843. Further, the classroom would have included content mastery teachers to help her in any subject. *Id.* at 180. As the RISD officials stressed during the December 2011 Meeting, the Transitions Classroom was a flexible environment that would have allowed M.C. the freedom to switch between subjects when she became frustrated or had trouble, and also to practice the independent study skills outlined in the Interim Plan. *Id.* at 180, 182. The special education teachers also used the Boys Town method of teaching, which is the same as what was employed at the DLC. *Id.* at 187, 592. To the extent M.C. wished to return to the mainstream classes, RISD was open to building in breaks to her schedule and allowing her to use the library or principal's office as a place for her to regroup. *Id.* at 183-84, 217-18. Though the implementation of these breaks was no doubt left unclear, there seems to have been agreement that the program was

going to be revised according to how M.C.'s responded to the new environment.[14] *Id.* at 218.

The Court recognizes that the Parents were concerned about possible social issues at RISD. In particular, they were concerned M.C. might be stigmatized as a "special ed" student, lack the opportunity to socialize with peers, or, worse, be bullied. These are not to be taken lightly and arguably go towards the non-academic benefit that a FAPE is expected to provide. Again, the evidence shows that RISD officials were sensitive to these concerns and committed to designing an IEP that would address them appropriately. The Transitions Classroom was not a permanent setting; M.C. could return to the mainstream environment as she was comfortable. *See, e.g.,* Pl. App. 907 (Transitions Classroom is "flexible in terms of the kind of skills being taught and the amount of special ed time, the amount of supports and structure available, but – so it would be tailored specifically to M."). Though M.C. was no doubt going to receive special education services, any possible "stigma" would arguably have been mitigated by the freedom she had to return to the "gen ed" environment. Further, the opportunity M.C. had to join clubs or other extracurricular activities would have also allowed her to socialize with a varied peer group and integrate with the broader student community. *Id.* at 891. To further assist M.C. during unstructured periods, the ARDC also proposed pairing M.C. with a student mentor from Friends of Rachel, which is a group that meets at lunch and "promotes kindness and compassion and acceptance of all people." *Id.* at 233.

---

[14] The Advocate stated as much:

> MS. LAVIOLA: Can we just add to the minutes real fast that we – . . . – that there was a discussion how to implement frequent breaks and that the ARD committee decided that we would wait to see what was happening when she was here; but in the interim, if there were any – if any problems should arise, the principal graciously offered to assist us if there should be any tardies as we work out this process?

Pl. App. 218.

With respect to the bullying, the Parents recognized the difficulty of addressing this issue, as it involved not only students with whom M.C. had previously had difficulty but also "a person she doesn't even know today, [who] tomorrow could be a problem." *Id.* at 191. Nevertheless, RISD proposed ways to protect M.C., including discussing the situation with her teachers, changing seating arrangements or schedules, having the Transitions Classroom teacher enter M.C.'s "gen ed" classrooms to observe, and also using covert monitoring in the hallway. *Id.* at 190-91. These suggestions were made while recognizing the need to avoid singling M.C. out. Even the Advocate remarked: "It's going to be subtle. So if she needs to take frequent breaks and she just want to look like the other kids, we can work in where, you know what, [M.C.] asked to go to the bathroom. . . . She can use it as a way to go to Coach Lane and take a break." *Id.* at 201. The Advocate went on: "You know, there are things that we can build in so she doesn't – . . . she doesn't look so different." *Id.*

In addition to these safeguards, RISD also proposed helping M.C. develop her own skills to respond to negative social encounters. *Id.* at 907. RISD's social skills curriculum focused on having "[t]he teachers support [the students] through structuring the environment, structuring their day, helping them to work through things so they have successes." *Id.* at 921. With respect to M.C. specifically, RISD's specialist in school psychology admitted at the due process hearing she did not know exactly how the program would be designed for her, but offered examples of how the curriculum might have applied:

> And so for M., I'm not sure exactly how that would have looked. At the beginning, she would have been with us more; and she came in very nervous, we would have prepped her more, talked to her more about what to do, and more role playing, more practicing at first, but then she would be out in the settings using it. . . .

> And we would also work with the regular ed teacher, make sure they have her behavior plan. Talk with M. I think one issue we talked about in our last ARD was that M. had concerns about particular students. So we would even be probably looking at who was in there and help M. think about what she needed to plan for in going into the room. . . .
>
> So we might talk with her about, If there's going to be paired work, M., hmm; would you like the teacher to assign you; would you like privately the teacher to assign you? So let's talk to the teacher ahead of time and have the teacher know ahead of time, I want to be paired with . . . and make sure those sorts of things set up.

*Id.* at 924-26. In addition, the psychologist also mentioned counseling sessions for M.C. to help improve self esteem, recognize triggers for anxiety, and practice ways to cope with triggers. *Id.* at 909.

To be sure, the Court does not intend to trivialize the Parents' concerns about M.C.'s return to RISD. However, the record shows that RISD's proposals did address her academic and behavioral issues and also incorporated the tools used successfully at the DLC. Accordingly, the Court finds they were"reasonably calculated to provide the student with appropriate opportunities to learn." *S.H.*, 487 F. App'x at 859.

To the extent the timing of M.C.'s return to RISD was not ideal, this is not the fault of RISD. Indeed, it is the Parents who initiated the process of transferring M.C. in the middle of the school year. Though there may have been merit to their later suggestion that M.C. remain at the DLC in the spring while taking a class at RISD after school, RISD was not obligated to accept this proposal. Indeed, once a district determines it can offer a student a FAPE, it is not responsible for providing educational services to the student until the parents choose to enroll her in public school full time. 19 Tex. Admin. Code § 89.1096(b).

In conclusion, the Court finds by preponderance of the evidence that RISD's proposed public

placement was appropriate under the IDEA.

2. <u>Was the Parents' Private Placement Appropriate?</u>

Because M.C. has failed to demonstrate that RISD's proposals were inappropriate, M.C. is not entitled to reimbursement for the spring 2012 semester at the DLC. Therefore the Court does not need to address whether the Parents' private placement was proper. *See R.H.*, 607 F.3d at 1016.

In conclusion, the Court finds by preponderance of the evidence: (1) RISD did not deny the Parents full participation in the IEP process; (2) RISD did not predetermine M.C.'s placement; (3) RISD's proposals to use the Transitions Classroom at RISD and implement the Interim Plan until the ARDC could reconvene were not inappropriate under the IDEA; and (4) M.C. was not entitled to tuition reimbursement for the spring 2012 semester. Accordingly, RISD's Motion for Summary Judgment with respect to its appeal of the IDEA decision is **GRANTED.**

*B. Breach of Contract*

The Court now considers RISD's second claim for breach of contract. RISD argues that M.C. breached the Settlement Agreement by filing its due process complaint "based largely on factual allegations arising prior to October 6, 2011." Pl.'s Br. 22. Further, RISD insists "[t]he Hearing Officer's written decision demonstrates she relied heavily upon the factual allegations arising prior to October 6, 2011 presented by Defendants in rendering her decision." *Id.* Finally, RISD argues that M.C. has admitted its breach by failing to deny the allegations included in paragraphs 6.1 to 6.5 of RISD's Complaint, which include the following statements:

> 6.3 Rockwall ISD has duly performed all the terms and conditions of the Settlement Agreement required of the District.
>
> 6.4 The Defendants breached the Settlement Agreement when they filed the Due Process Complaint on or about February

> 22, 2012, based on factual allegations arising prior to the date of the execution of the Settlement Agreement.

*Id.* at 23; Compl. 8-9.

In response, M.C. argues that the Hearing Officer did not in fact rely on any events that occurred prior to the date of the Settlement Agreement. Defs.' Resp. 33. Instead, the Hearing Officer "focuses on events that occurred, for the most part, in December 2011, *after* the date of the Settlement Agreement." *Id.* (emphasis in original). In addition, M.C. denies she admitted the allegations in RISD's Complaint. She maintains paragraphs 6.1 to 6.5 of the Complaint were contained in RISD's "Count II-Breach of Contract" section and are redundant with paragraph 4.21 of the pleading, which M.C. specifically denied in her Answer. *Id.*

Rule 8(b)(6) states that "[a]n allegation–other than one relating to the amount of damages–is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6). This Rule, like all of the Federal Rules of Civil Procedure, is to be "construed and administered to secure the just, speedy, and inexpensive determination of every action." *Ruiz v. Prudential Ins. Co. of America.*, No. 4:07-CV-029-BE, 2008 WL 3823257, at *3 (N.D. Tex. Aug. 14, 2008) (citing Fed. R. Civ. P. 1). Further, pleadings themselves must be construed so as to do justice. *Id.* (citing Fed. R. Civ. P. 8(e)). They "are not to be treated as a game of skill in which one misstep by counsel may be decisive of the outcome." *Trotter v. Jack Anderson Enters. Inc.*, 818 F.2d 431, 436 (5th Cir. 1987) (finding that failure to answer had no effect on opponent's rights because he had notice that matter was to be litigated).

Here, M.C. did indeed fail to deny the allegations set forth in paragraphs 6.1 to 6.5 of RISD's Complaint. However, M.C. denied the related allegation set forth in paragraph 4.21 that "Both the

Defendants' presentation at the Hearing, and the Hearing Officer's decision dated August 7, 2012, are largely based upon alleged facts arising prior to the date of the Settlement Agreement." Compl. 6; Ans. 3 at ¶ 27. The Court agrees that this statement is redundant with the allegation in paragraph 6.4 of RISD's Complaint. Accordingly, under the particular circumstances, M.C.'s failure to address paragraphs 6.3 and 6.4 do not constitute a failure to deny for purposes of deeming these allegations admitted. By virtue of M.C.'s prior denial, she addressed the alleged breach of contract and effectively gave RISD notice that the issue would be litigated.

The Court now considers the merits of the breach of contract claim. "The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument." *Texas v. American Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006). "If a written contract is worded such that it can be given a definite or certain legal meaning, then it is not ambiguous." *Id.* Here, the Settlement Agreement clearly prohibited the Parents from filing "any litigation, grievance, or complaint of any kind . . . based on any factual allegations . . . arising through the date of the execution of this AGREEMENT," which was October 6, 2011. Pl. App. 328-29. The question thus is whether the request for a due process hearing was based on factual allegations up to and including the date of the Settlement Agreement. The Court agrees with M.C. and the Hearing Officer that it was not. *See, e.g., id.* at 24 (Hearing Officer's conclusion of law that applicable statutory period in dispute ran from date of signed Settlement Agreement forward). M.C.'s claim that RISD failed to provide her with a FAPE stems from RISD's proposal at the December 2011 Meeting and the Interim Plan proposed thereafter. That she, the Hearing Officer, and this Court discussed facts prior to the Settlement Agreement is not dispositive, as they served as context–not a basis–for the claim. Thus, RISD's reliance on the number of pages in M.C.'s filings or the length of discussion

at the due process hearing regarding facts pre-dating the settlement is unavailing. RISD has failed to demonstrate how M.C.'s claims regarding the alleged procedural or substantive deficiencies of the December 2011 Meeting and resulting proposals are based on facts "arising through the date of the execution" of the Settlement Agreement. *Id.* at 329. Accordingly, RISD's motion for summary judgment with respect to breach of contract is **DENIED.**

## IV.

## CONCLUSION

For the foregoing reasons, RISD's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** as follows:

Regarding RISD's appeal of the Hearing Officer's decision, RISD's Motion is **GRANTED.** The Court concludes that RISD complied with the IDEA's procedural requirements regarding parental involvement; RISD's proposals developed through the Act's procedures were reasonably calculated to enable M.C to receive educational benefit; and M.C. was not entitled to reimbursement for tuition or course fees for the spring 2012 semester at the Dallas Learning Center. Accordingly, the Court further **ORDERS** the decision of the Hearing Officer be and is hereby **REVERSED in its entirety.**

Regarding RISD's breach of contract claim, RISD's Motion is **DENIED**. The Court concludes that the complaint for a due process hearing did not violate the Settlement Agreement, and RISD is not entitled to any damages, attorneys' fees, or costs for this claim.

**SO ORDERED.**

**SIGNED: February 17, 2014.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE